[Cite as *In re I.C.*, 2026-Ohio-3016.]

IN THE OHIO COURT OF APPEALS
FIFTH APPELLATE DISTRICT
LICKING COUNTY, OHIO

IN RE: I.C.

| | |
|---|---|
| Case No. 26CA00026 |

<u>Opinion And Judgment Entry</u>

Appeal from the Licking County Court of
Common Pleas, Case No. 2023-0304

Judgment:   Affirmed

Date of Judgment Entry: August 5, 2026

BEFORE:   Andrew J. King, William B. Hoffman, J. and Kevin W. Popham, Judges

APPEARANCES: Kenneth W. Oswalt, for LCJFS; Jermaine L. Colquitt, for Mother

OPINION

*Popham, J.,*

{¶1}   Appellant R.J. ("Mother") appeals the February 26, 2026, Judgment Entry of the Licking County Court of Common Pleas, Juvenile Division, terminating her parental rights and awarding permanent custody of her minor child, I.C., to appellee, Licking County Jobs and Family Services, Children Services Division ("the Agency"), pursuant to R.C. 2151.414. For the reasons below, we affirm.

**Facts and Procedural History**

**Initiation of the Case**

{¶2} Mother is the biological mother of I.C. ("the Child")[1]. I.C. was born June 6, 2023. The Agency became involved with the family on August 14, 2023, after Mother was removed from a Salvation Army shelter for failing to comply with program requirements. Mother left most of the Child's belongings at the shelter and was residing with the Child in a tent in the woods.

{¶3} On August 16, 2023, the Agency located Mother at a motel where she was staying with the Child, the Child's father, and two other individuals. Mother admitted she had been homeless since reaching adulthood and that she only had one more day remaining at the motel. She had no plan for housing thereafter and expected either another occupant to pay for additional nights or to return to the tent.

{¶4} The motel room was dirty and odorous. The Child slept either in a car seat or in bed with Mother. The Child's clothing was saturated from a soiled diaper, she appeared dirty, and she smelled of urine. The Agency offered to assist Mother in obtaining housing provided Father, who was actively using drugs, did not reside with her and the Child.

{¶5} Both parents had significant substance abuse histories. Mother admitted using methamphetamine daily until she learned she was pregnant. Father was experiencing severe withdrawal symptoms when the Agency contacted him. He also lacked stable employment and housing, had an extensive criminal history, and previously had his parental rights terminated with respect to another child.

---

[1] The biological father is not a party to this appeal.

{¶6} Because of these concerns, the Agency obtained an emergency ex parte order removing the Child on August 16, 2023.

{¶7} On August 17, 2023, the Agency filed a complaint alleging the Child was a dependent child and requested emergency shelter care. The juvenile court granted emergency custody, and the Child was placed with foster caregivers alongside her half-brother. Following an uncontested adjudicatory hearing on October 16, 2023, the juvenile court adjudicated the Child dependent and immediately proceeded to disposition, placing the Child in the Agency's temporary custody. Mother was granted supervised visitation.

**Case Plan and Review Proceedings**

{¶8} The juvenile court granted two extensions of temporary custody while Mother worked toward reunification. During the pendency of the case, Mother progressed from supervised visitation to extended unsupervised visitation after the Agency moved for expanded parenting time.

{¶9} Throughout the proceedings, the juvenile court repeatedly found that the Agency had made reasonable efforts to prevent the Child's continued removal and to reunify the family.

**Permanent Custody Proceedings**

{¶10} On June 5, 2025, the Agency filed a motion requesting legal custody of the Child be granted to the child's foster caregivers, Wendy and John Pittman. On August 26, 2025, the Agency instead filed a motion for permanent custody.

{¶11} The juvenile court conducted the permanent custody hearing, during which the following evidence was presented.

**Testimony of Mark Thomas**

{¶12} Mark Thomas testified that Mother had lived with him since the spring of 2024 in a two-bedroom apartment pursuant to a landlord-approved sublease. (Tr. at 19, 30, 32). He testified that Mother contributed toward rent and utilities, the utilities remained current, and no eviction proceedings had been filed. (Tr. at 30, 32). Thomas further testified the apartment contained adequate furnishings and food, and both bedrooms were furnished. (Tr. at 33). At the time of the hearing, Thomas was earning between $300 and $500 per week.

{¶13} Thomas testified that he requested to be added to Mother's case plan. (Tr. at 24, 35). Although he had previously been charged with assault, he exercised his right to trial and was found not guilty. (Tr. at 22, 34). Thomas testified he informed the caseworker of the acquittal and was told overnight visitation would resume once verification was received. According to Thomas, however, overnight visits never resumed. (Tr. at 38-39).

{¶14} Thomas further testified that he participated in couples counseling through Ohio Guidestone and attempted to locate anger-management services that accepted his insurance. (Tr. at 41-43). He acknowledged prior convictions for aggravated trafficking and marijuana offenses. (Tr. at 53-54).

**Testimony of Mother**

{¶15} Mother testified she had been employed at Arby's since July 2025 and supplemented her income through Instacart after previously working other jobs. (Tr. at 64-66).

{¶16} Mother acknowledged that she and Thomas had experienced domestic disputes and admitted some incidents had become physical. (Tr. at 67-70). She also acknowledged that her prior relationship with the Child's father had been physically abusive, attributing much of

that violence to her former methamphetamine addiction. Mother testified she had not used methamphetamine since 2024. (Tr. at 68-70).

{¶17} Mother testified the case plan required her to complete parenting classes but admitted she had not done so. (Tr. at 81-82, 131-132). She nevertheless noted that the Agency had previously expanded her visitation to unsupervised visits despite the incomplete parenting requirement. (Tr. at 105).

{¶18} Mother further testified she participated in counseling through Ohio Guidestone for several years, where she received treatment for depression, anxiety, post-traumatic stress disorder, and major depressive disorder. (Tr. at 73-75, 115-119). She testified she self-medicated with marijuana.

{¶19} Mother testified she signed all requested releases, participated in couples counseling with Thomas, and understood she was instructed to complete either couples counseling or anger-management counseling. (Tr. at 74-75, 119).

{¶20} Mother testified she progressed to unsupervised visitation beginning in January 2025. (Tr. at 106). Those visits ended after Thomas was charged with assault. Although Thomas was ultimately acquitted, Mother testified that unsupervised visitation was never reinstated despite her requests. She testified that she was told that decision rested with the guardian ad litem. (Tr. at 106-108).

{¶21} Mother described the Child as her "best friend." She testified that the Child recognized her as "Mommy," became excited during visits, hugged her, and sometimes asked Mother not to leave when visits concluded. (Tr. at 110). Mother further testified she consistently exercised visitation throughout the case and regularly provided clothing, shoes,

toys, and gifts for the Child. (Tr. at 112, 114), with whom Mother believed she shared a healthy and loving relationship.

**Testimony of Foster Mother**

{¶22} Since removal, the Child has resided with foster caregivers Wendy and John Pittman.

{¶23} Ms. Pittman acknowledged that Mother and the Child shared a positive relationship. She testified Mother was attentive and engaged during visits, the Child loved Mother, and she had not observed behavioral problems following visitation. (Tr. at 139, 146, 151).

{¶24} Ms. Pittman's concerns centered on Mother's relationship with Thomas. She testified that Thomas treated Mother poorly and recalled receiving a text message from Mother in January 2025 asking Ms. Pittman to pick her up because Thomas had physically assaulted her. (Tr. at 140-143). Ms. Pittman also expressed concern that Mother and Thomas used marijuana while caring for the Child. (Tr. at 143).

{¶25} Ms. Pittman testified she and her husband offered Mother and the Child a place to live rent free, but Mother declined because she wished to remain with Thomas. (Tr. at 147-148).

**Testimony of Caseworker Brittany Adzic**

{¶26} Brittany Adzic testified she became the ongoing caseworker in December 2024. (Tr. at 154-155).

{¶27} Adzic acknowledged that she never observed any concerns regarding Mother's interactions with the Child and described Mother as "always ... a great parent and very attentive." (Tr. at 156, 172). She further testified Mother's reduced work hours were not

Mother's fault and stated she had no reason to doubt Mother was supplementing her income through Instacart. (Tr. at 184-185). Adzic also acknowledged Thomas was ultimately acquitted of the assault charge that resulted in Mother's loss of unsupervised visitation. (Tr. at 190).

{¶28} Adzic nevertheless expressed continuing concerns regarding Mother's relationship with Thomas. She testified Thomas failed to complete required mental-health services and twice tested positive for THC. (Tr. at 160). She also described several incidents of domestic violence between Mother and Thomas and noted Mother repeatedly returned to the relationship. (Tr. at 166-168).

{¶29} Adzic further testified she observed marijuana openly displayed in the home and saw what appeared to be a firearm and brass knuckles, although Mother claimed the items were a lighter and decorative objects. (Tr. at 169-170).

{¶30} Finally, Adzic testified she could not recall whether she specifically discussed the parenting-class requirement with Mother. (Tr. at 172).

**Trial Court Decision**

{¶31} On February 26, 2026, the juvenile court granted the Agency's motion for permanent custody and terminated Mother's parental rights.

**Assignments of Error**

{¶32} Mother raises two assignments of error,

{¶33} "I. THE TRIAL COURT'S DETERMINATION THAT I.C. COULD NOT OR SHOULD NOT BE PLACED WITH APPELLANT-MOTHER WITHIN A REASONABLE TIME PURSUANT TO R.C. 2151.414(B)(l)(a) WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶34}** "II. THE TRIAL COURT'S DETERMINATION THAT PERMANENT CUSTODY WAS IN I.C.'S BEST INTERESTS PURSUANT TO R.C. 2151.414(D) WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**Fundamental Rights and Governing Standards**

**{¶35}** A parent's right to raise his or her child is an essential and fundamental liberty interest protected by the United States and Ohio Constitutions. *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645 (1972); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Because the permanent termination of parental rights has been described as "the family law equivalent of the death penalty," parents must be afforded every procedural and substantive protection the law allows. *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991). Accordingly, a juvenile court may grant permanent custody only upon clear and convincing evidence. R.C. 2151.414(B)(1).

**Standard of Review**

**{¶36}** The Supreme Court of Ohio has explained that appellate review of permanent custody decisions proceeds under the sufficiency-of-the-evidence and manifest-weight-of-the-evidence standards, depending upon the arguments presented. *In re Z.C.*, 2023-Ohio-4703, ¶ 18. Mother's assignments of error invite manifest weight of the evidence review.

**Manifest Weight**

**{¶37}** Manifest weight review concerns the persuasiveness of the evidence. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. We review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether the juvenile court

clearly lost its way, creating a manifest miscarriage of justice. *Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶38} Nevertheless, because the juvenile court personally observes the witnesses, we afford substantial deference to its credibility determinations. *Eastley* at ¶ 21; *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). An appellate court sits as the thirteenth juror only when evidence contradicts a fact-finder's findings, *see State v. Martin*, 2022-Ohio-4175, ¶ 26, or when a witness's testimony is so inconsistent as to material facts, so impeached, or so fantastical as to make it patently unbelievable. Without conflicting testimony or evidence that completely discredited the witnesses' testimony the appellate court had nothing to weigh. *State v. Reillio,* 2026-Ohio-2701, ¶ 3.

{¶39} Reversal on manifest weight grounds is reserved for the exceptional case in which the evidence weighs heavily against the judgment.

{¶40} Mother challenges only the manifest weight of the evidence.

**Statutory Framework**

{¶41} Before granting permanent custody, the juvenile court must find by clear and convincing evidence that one of the circumstances listed in R.C. 2151.414(B)(1)(a) through (e) exists and that permanent custody is in the child's best interest under R.C. 2151.414(D).

{¶42} Here, the juvenile court found both that the Child could not or should not be placed with Mother within a reasonable time under R.C. 2151.414(B)(1)(a) and that the child had been in the Agency's temporary custody for at least twelve months of a consecutive twenty-two-month period under R.C. 2151.414(B)(1)(d).

**Twelve of Twenty-Two Months**

{¶43} The "12 of 22" provisions reflect the General Assembly's effort to balance a parent's opportunity to achieve reunification with a child's need for permanency. *In re C.W.*, 2004-Ohio-6411.

{¶44} A child is considered to have entered an agency's temporary custody on the earlier of the adjudication date or sixty days after removal. R.C. 2151.414(B)(1)(e).

{¶45} Testimony was presented that the Child was removed from Mother's home on August 6, 2023. Pursuant to R.C. 2151.414(B)(1)(e), sixty days from August 6, 2023, was October 5, 2023. The juvenile court adjudicated the Child as a dependent child by Judgment Entry filed October 20, 2023. Accordingly, the "earlier date" that the Child will be deemed to have entered the temporary custody of the Agency for purposes of R.C. 2151.414(B)(1)(d) is October 5, 2023. The Agency filed its motion for permanent custody on August 26, 2025, well after the Child had remained in temporary custody for more than twelve months of a consecutive twenty-two-month period.

{¶46} Accordingly, the juvenile court correctly found that R.C. 2151.414(B)(1)(d) was satisfied.

{¶47} Because the findings under R.C. 2151.414(B)(1)(a) and (d) are alternative grounds for permanent custody, either finding independently satisfies the first prong of the permanent-custody analysis. *In re Dalton*, 2007-Ohio-5805 (5th Dist.); *In re Calhoun*, 2008-Ohio-5458 (5th Dist.).

{¶48} Mother does not challenge the juvenile court's finding under R.C. 2151.414(B)(1)(d). Accordingly, that finding alone, together with a proper best-interest

determination, supports the permanent custody award. Nevertheless, in the interest of completeness, we address Mother's arguments concerning R.C. 2151.414(B)(1)(a).

**Placement Within a Reasonable Time**

**{¶49}** Under R.C. 2151.414(E), if the juvenile court finds clear and convincing evidence that one of the enumerated factors exists, it must enter a finding that the Child cannot or should not be placed with that parent within a reasonable time. *In re William S.*, 75 Ohio St.3d 95 (1996).

**{¶50}** Competent, credible evidence supports the juvenile court's findings.

**{¶51}** Mother acknowledged that her relationship with Thomas had involved repeated domestic disputes and that some incidents became physical. She further acknowledged that her previous relationship with the Child's father was physically abusive. Mother admitted she had not completed the parenting education required by her case plan. She also testified that she suffered from depression, anxiety, PTSD, and major depressive disorder and continued to use marijuana.

**{¶52}** Foster mother Wendy Pittman testified that Mother contacted her during one domestic incident requesting assistance because Thomas had placed his hands on her. Pittman also testified that she remained concerned about Mother's relationship with Thomas and the couple's marijuana use. Although the Pittmans offered Mother and the Child housing without charge, Mother declined because she wished to continue living with Thomas.

**{¶53}** Caseworker Brittany Adzic likewise expressed continuing concerns regarding Mother's relationship with Thomas. She testified Thomas failed to complete required mental health services, twice tested positive for THC, and that the relationship continued to involve

domestic violence. Although Mother periodically expressed a desire to leave the relationship, she repeatedly returned to Thomas despite receiving referrals to domestic violence resources.

**{¶54}** The Guardian ad Litem recommended that permanent custody be granted.

**{¶55}** Although the record reflects Mother made meaningful progress in several respects, including maintaining employment, obtaining housing, participating in counseling, and maintaining a positive relationship with her Child, the juvenile court reasonably concluded that significant concerns remained regarding domestic violence, substance use, and completion of critical case-plan objectives.

**{¶56}** Completion of portions of a case plan does not, standing alone, preclude an award of permanent custody. A case plan is a means to achieve reunification, not an end in itself. *In re J.L.*, 2004-Ohio-6024, ¶ 20 (8th Dist.). The dispositive question is whether the parent has substantially remedied the conditions that caused the child's removal.

**{¶57}** Upon our review of the record, we conclude competent, credible evidence supports the juvenile court's determination that the Child could not or should not be placed with Mother within a reasonable time.

**Best Interest**

**{¶58}** When determining a child's best interest, the juvenile court must consider all relevant factors under R.C. 2151.414(D)(1). No single factor controls. *In re Schaefer*, 2006-Ohio-5513, ¶ 56.

### Interaction and Interrelationship

{¶59} The evidence demonstrated that Mother and the Child shared a loving and positive bond. Multiple witnesses acknowledged Mother's appropriate interactions during visitation, and both the foster mother and case worker testified Mother was attentive to the Child's needs during visits.

{¶60} The Child was likewise bonded with her foster family, where she had resided continuously since removal, together with her half sibling.

### Wishes of the Child and Custodial History

{¶61} Because of the Child's young age, she was unable to express her wishes directly. The Guardian ad Litem recommended permanent custody.

{¶62} The Child had remained in Agency custody for approximately two years and had spent virtually her entire life in the same foster placement, where she was thriving.

### Need for Legally Secure Placement

{¶63} The record supports the juvenile court's conclusion that the Child required a legally secure permanent placement.

{¶64} Although Mother demonstrated commendable progress in several areas, the juvenile court reasonably determined that unresolved concerns regarding domestic violence, marijuana use, and incomplete compliance with significant portions of the case plan prevented reunification within a reasonable time. The evidence further demonstrated the foster family was able to provide permanence and stability.

### Additional Factors

{¶65} The juvenile court also properly considered the remaining statutory factors and the Guardian ad Litem's recommendation.

**Conclusion**

{¶66} After reviewing the entire record, we conclude the juvenile court's findings are supported by clear and convincing evidence and are not against the manifest weight of the evidence.

{¶67} The evidence supports the juvenile court's determination that the Child had remained in the Agency's temporary custody for more than twelve months of a consecutive twenty-two-month period. That finding alone, together with the juvenile court's best-interest determination, independently supports the permanent custody award.

{¶68} Moreover, competent, credible evidence supports the juvenile court's determination that the Child could not or should not be placed with Mother within a reasonable time under R.C. 2151.414(B)(1)(a). Finally, after considering each factor set forth in R.C. 2151.414(D), we conclude the juvenile court did not err in determining that permanent custody is in the Child's best interest.

{¶69} Accordingly, Mother's first and second assignments of error are overruled.

{¶70} For the reasons stated in our Opinion, the judgment of the Licking County Court of Common Pleas, Juvenile Division, is affirmed.

{¶71} Costs to be paid by Appellant-Mother, R.J.


By: Popham, J.

King, P.J. and

Hoffman, J., concur